**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

```
MARIANN DOWLING,            )
                            )
            Plaintiff,      )    Civil Action No. 05-914
                            )
     v.                     )    Judge Cercone
                            )    Magistrate Judge Caiazza
CITIZENS BANK,              )
                            )
            Defendant.      )
```

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that the Defendant's Motion for Summary Judgment (Doc. 24) be granted.

### II.  REPORT

The Plaintiff Mariann Dowling has brought this employment discrimination lawsuit against her former employer Citizens Bank ("the Defendant" or "the Bank").  Ms. Dowling's employment was terminated in May 2004, and she alleges discrimination based on sex, age, her association with a disabled person (her husband), and her anticipated exercise of rights under the Family Medical Leave Act.  *See generally* 1st Am. Compl. (Doc. 13).  She also asserts a claim under the PHRA.  *See id.*

The Plaintiff cannot refute the Defendant's legitimate, non-discriminatory reasons for her termination, and summary judgment therefore should be granted.

**BACKGROUND**

The Plaintiff was employed as Branch Manager of the Defendant's Peebles Road location.  *See* Def.'s Statement of Material Facts (Doc. 26) at ¶ 2.[1]  Her performance was evaluated based on, among other things, her ability to meet management goals regarding the number of new consumer checking accounts opened.  *See generally id.* at ¶ 5.  Meeting the goals made Ms. Dowling eligible for incentive bonuses, including Bank-paid trips to vacation resorts.  *See id.* at ¶¶ 5-6.  Shortly before her termination, the Plaintiff was awarded a trip to the Atlantis resort on Paradise Island.  *Id.* at ¶ 6.

In March 2004, the Plaintiff's supervisor, Regional Director Craig Campbell ("Mr. Campbell"), received an anonymous letter indicating that the Plaintiff and one of her Sales and Service Representatives ("SSRs"), Teresa Rotondo ("Ms. Rotondo"), were engaging in improper conduct regarding consumer checking accounts:

> First, this letter is from more than one person and we apologize up front for not signing it in fear of retribution. . . . Calls have been made to the alert line and obviously nothing has been done. . . .
>
> Someone needs to seriously research Mariann[] Dowling and Teresa Rotondo of the Peebles Rd. office for gaming in checking accounts.

---

[1]  Unless otherwise noted, the undersigned relies on the Defendant's statements of fact only to the extent they are not materially disputed.

> Everyone in our region knows, it's like an
> unspoken issue among us.  We don't think it's
> fair because . . . she keeps being rewarded
> with trips and incentive[s] and those of us
> that make our goals the right way are
> overlooked.  We could never figure out how
> she always pulled out making her goal.  The
> proof is all in black and white, you just
> need to look.

*See* Def.'s Statement of Facts at ¶ 7 (quoting record evidence).

Consequently, the Director of Corporate Security Matt Clydesdale ("Mr. Clydesdale") and auditor Jean Yates ("Ms. Yates") were called upon to conduct an investigation regarding the checking accounts opened by the Plaintiff and Ms. Rotondo.  The investigation revealed that Ms. Dowling had been opening accounts with nominal initial deposits in her name, as trustee for relatives, and for family members, neighbors and friends, often times listing the accounts at her residence address, and the accounts were being closed after relatively short periods with little or no checking activity.  *See id.* at ¶¶ 8-9 (citing record evidence).  Later evaluation identified 114 accounts that were opened shortly before the close of a quarter, had little or no checking activity thereafter, and were closed.  *See id.* at ¶ 9; *see also, e.g.,* Exs. A & B to Decl. of M. Clydesdale (filed under Doc. 27-2) (identifying, for example, forty-two checking accounts opened in Plaintiff's name and eighteen in her son's name in years 2002-2003, many of which reflected little or no checking activity).  Similar findings were

-3-

made regarding Ms. Rotondo and Assistant Branch Manager Terry Braun ("Ms. Braun").  *See* Def.'s Statement of Facts at ¶ 10.

When confronted regarding the accounts, Ms. Dowling indicated her belief she did nothing wrong.  *See generally* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 31) at ¶ 9. Specifically, the Plaintiff relied on management's having encouraged her to solicit friends, family and neighbors to open checking accounts, as well as the purported absence of Bank policies regarding the number of checking accounts an employee or family member could open and/or criteria for determining what constituted a legitimate account.  *See id.* at Counter-Statement of Facts ¶¶ 21, 24.

Mr. Campbell decided to terminate the Plaintiff's employment.  According to Ms. Dowling, she was told that she was being discharged because Mr. Campbell "no longer had confidence in her as a manager."  *See* Pl.'s Opp'n Br. (Doc. 30) at 5 (citing record evidence).

Ms. Braun's employment also was terminated, but Ms. Rotondo's was not.  *See generally* Def.'s Statement of Facts at ¶ 14.  According to the Defendant, Ms. Rotondo was only issued a warning because "it appeared that she was acting under the instruction[] and with the knowledge of Ms. Dowling," and Mr. Campbell thought her less culpable "given her status as a less experienced nonmanagement employee."  *Id.*

**ANALYSIS**

1. **The Burden-Shifting Analysis in *McDonnell Douglas*
      Applies to All of the Plaintiff's Claims.**

As referenced above, Ms. Dowling alleges discrimination
under Title VII and the PHRA (sex), the ADEA (age), the ADA
(association with a disabled person), and retaliation under the
FMLA. *See generally* 1st Am. Compl. at Counts I-III, V-VI.
All of these claims are governed by the burden-shifting analysis
in *McDonnell Douglas*. *Compare* Pl.'s Opp'n Br. at 4-5, 24
(arguing that Defendant's proffered non-discriminatory reasons
were pretext) *with* Scheidemantle v. Slippery Rock Univ. State
Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (applying
*McDonnell Douglas* to sex discrimination claims under Title VII
and PHRA); Tomasso v. Boeing Co., 445 F.3d 702, 704 (3d Cir.
2006) (same for ADEA); Watson v. Southeastern Pa. Transp. Auth.,
207 F.3d 207, 221 (3d Cir. 2000) (same for ADA), *cert. denied*,
531 U.S. 1147 (2001); Lepore v. Lanvision Sys., Inc., 2004 WL
2360994, *3  (3d Cir. Oct. 19, 2004) (same for FMLA retaliation)
(citing published Third Circuit precedent).

The only remaining claim is one for "interference" or
"entitlement" under the FMLA. *Compare* 1st Am. Compl.
at Count IV (alleging "[i]nterference [w]ith FMLA [p]rotected
[r]ights") *with* Callison v. City of Phila., 430 F.3d 117, 119
(3d Cir. 2005) (distinguishing between "two relatively distinct

types" of claims under FLMA, those for retaliation and those regarding "'entitlement' or 'interference'") (citation omitted). In this regard, the Plaintiff alleges the Defendant terminated her employment because it knew "she may very well [have] need[ed] to take . . . time off work due to her husband's [medical] condition."  *See* Pl.'s Opp'n Br. at 20.

Although Plaintiff's counsel has characterized Ms. Dowling's anticipated need for FMLA leave as a matter of "interference," many courts have framed the issue in terms of retaliation.  *See, e.g.*, <u>Santosuosso v. NovaCare Rehab.</u>, -- F. Supp.2d --, 2006 WL 3408226, *5-6 (D.N.J. Nov. 22, 2006) (addressing alleged retaliation for plaintiff's anticipated FMLA leave); <u>Butler v. IntraCare Hosp. North</u>, 2006 WL 2868942, *6 (S.D. Tex. Oct. 4, 2006) (same).  Whether viewed as a matter of interference or retaliation, however, the Plaintiff's claim regarding anticipated FMLA leave remains bound by the standards in *McDonnell Douglas*.  *See, e.g.*, <u>Satterlee v. Allen Press, Inc.</u>, 443 F. Supp.2d 1236, 1244 (D. Kan. 2006) ("[a] plaintiff's interference claim . . . fail[s if] she cannot demonstrate a [causal] connection between her [anticipated] leave and her termination"; "[a] reason for dismissal that is unrelated to a request for . . . FMLA leave will not support recovery under an interference theory") (citations in footnote omitted); <u>Moran v. Wal-Mart Corp.</u>, 2003 WL 21653126, *5 (N.D. Tex. Apr. 1, 2003)

(plaintiff "failed to offer any evidence that [the d]efendant in any way interfered with" FMLA rights where her termination prior to anticipated medical leave "was based on the legitimate, nondiscriminatory, non-pretextual reason of employee theft").

As just seen, all of the Plaintiff's claims fail if she is unable to sufficiently discredit the Defendant's legitimate, non-discriminatory reasons for her termination. *See generally* Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  In this regard, the Plaintiff cannot simply show that the employer's decision was wrong or mistaken, as the relevant question is whether discriminatory animus motivated the employer, not whether it was wise, shrewd, prudent, or competent. *Id.* at 765 (citations omitted).  Rather, the Plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence. *Id.* (citations omitted).

The Plaintiff cannot meet these standards, and the Defendant is entitled to summary judgment.

### 2.   The Plaintiff Has Produced Insufficient Evidence of Pretext.

#### A.   Ms. Dowling's Justifications for Her Behavior, and Her Belief that They Demonstrate Pretext

Ms. Dowling does not deny that she, her friends, and family opened multiple checking accounts in which little or no checking

activity resulted.  *See generally* discussions *supra*; *cf. also, e.g.*, Pl.'s Counter-Statement of Facts at ¶ 26 (Plaintiff "would open accounts and give them to relatives as gifts").  In essence, she does not dispute the conduct with which she was charged, just the way it has been characterized.  Her defenses fall within two, arguably somewhat inconsistent, categories:  "I didn't do anything wrong," and "if I did do wrong, the Bank made me do it." *See* discussions *supra* and *infra*.  Neither of these theories cast doubt on the Defendant's legitimate, non-discriminatory reasons for her discharge.

The Plaintiff maintains that her conduct was acceptable, and the Defendant's rejection of it pretext, because the Bank had not instituted specific policies prohibiting the same.  *See generally* discussion *supra.*  Contrary to Ms. Dowling's position, however, the Defendant has put forth evidence demonstrating that the conduct ran afoul of existing Bank policies.  *See, e.g.*, Def.'s Br. at 10-11 (2003 Retail Incentive Program Summary specifically stated that "any attempts at gaming, altering or modifying results in any element of the employee incentive program are grounds for withholding payments and disciplinary action up to and including termination") (citing record evidence); *id.* at 11 (Defendant's code of ethics stated that "efforts by any employees to conceal or distort information will be considered . . . unacceptable conduct").  Even Ms. Dowling has admitted that,

(a) if the only purpose for opening an account was to receive performance incentives, this would violate Bank policy, and (b) at least "[s]ome" of the accounts she opened were "solely for [the] purposes of increasing [her] performance." *See id.* at 12-13 (quoting Plaintiff's deposition testimony).

Even assuming there were no policy guidelines prohibiting Ms. Dowling's specific actions, her protestations provide no reasonable basis for finding pretext. Both human experience and common sense dictate that the Plaintiff's conduct was improper. Under the Plaintiff's theory, an employer would have no grounds for terminating an employee for any type of obvious impropriety if there existed no specific, formal policy prohibiting the same. The Plaintiff's highly legalistic defenses ignore reality, and they would seem better suited for the political arena than a civil lawsuit seeking affirmative relief.[2]

Next is the Plaintiff's reliance on the Bank's having encouraged her to have friends, family and neighbors open checking accounts. It is one thing for a bank employee to encourage friends or family members to switch banks (or maintain a checking account at a second bank), with the understanding that such an account would be meaningfully used, to provide a valuable

---

[2] Although the undersigned believes that reasonable minds could not differ on this matter, the Plaintiff must do more than show that the Defendant's decision was wrong, mistaken, unwise, imprudent, or incompetent. *See* discussion *supra.* Under these standards, there can be no debate, and the Plaintiff has failed to show pretext.

service and at the same time enhance the performance level of the associated employee.  It is quite another thing for the employee to open multiple checking accounts in her own name and others, with few actually being used for legitimate bank business. Although Ms. Dowling may believe that opening a series of shell accounts "satisf[ies] a customer need," *see* Dep. Tr. at 42-43, she would be hard pressed to explain this interpretation to a rational person.

Finally, the Plaintiff highlights the pressure brought to bear on Bank employees to meet performance goals.  *See, e.g.*, Pl.'s Counter-Statement of Facts at ¶¶ 17-18 (management held conference calls three days a week regarding performance and, "[i]f branch managers did not meet their goals, they were made fun of during the meeting . . . and were often required to attend special workshops that started at 7:30 a.m."). Even assuming these things to be true, it does not follow that an employee would be justified in taking improper and/or violative action to meet or exceed performance expectations.  While Ms. Dowling truly may have felt the victim, she has not cast reasonable doubt on the Bank's legitimate, non-discriminatory reasons for her termination.

B.    The Bank's Articulations of Its Legitimate, Non-
Discriminatory Reasons Were Consistent.

The Plaintiff also argues that the Defendant's reasons for
her termination have shifted, and therefore are unworthy of
credence.  The undersigned disagrees.

Counsel first highlights Ms. Dowling's testimony that she
was not told her termination was based on "gaming" accounts,
but rather was related to Mr. Campbell's lack of confidence in
her as a manager.  *See* Pl.'s Opp'n Br. at 5.  Ms. Dowling was
well aware of the investigation into her accounts, however,[3] and
the findings were consistent with Mr. Campbell's vote of non-
confidence.  Contrary to counsel's suggestion, this is not a case
where the employer first identified one basis for adverse
employment action and later changed to an unrelated or
inconsistent reason.  *See* cases cited in Pl.'s Opp'n Br. at 6-7.
The fact that Mr. Campbell did not specifically mention "gaming"
during the termination meeting is inconsequential.

Counsel also highlights that the Bank's EEO statement made
reference to Mr. Campbell "[losing] confidence in [Ms.] Dowling
. . . because she was guilty of failing to properly supervise her
staff based on [Assistant Branch Manager] Braun's improper use of
the general ledger without her knowledge."  *See id.* at 6.  The
Plaintiff neglects to mention, though, that references to the

---

[3]  *See* Def.'s Statement of Facts at ¶ 11 (indicating that Ms. Dowling
was interviewed by Mr. Clydesdale regarding questionable accounts).

-11-

supervision of Ms. Braun came in the "[r]esponse" section of the EEO filing, after Defense counsel devoted three pages of text to Ms. Dowling's suspicious account activity.

The Bank has consistently identified the Plaintiff's account practices, and management's resulting lack of confidence, as the primary bases for her termination, and the fact that subsidiary reasons were mentioned does not cast reasonable doubt on the proffered legitimate reasons.

### C.   The Alleged Comments of Mr. Campbell Are Insufficient to Demonstrate Pretext.

The Plaintiff claims that, before the investigation into her questionable account activity, Regional Manager Charlotte Bullock ("Ms. Bullock") told her Mr. Campbell "was making noises that she was not the right person for the Peebles Road branch."  *See* Pl.'s Opp'n Br. at 12 (citing Plaintiff's testimony).  Ms. Dowling alleges that, when she asked why Mr. Campbell would make such a comment, "the most [Ms.] Bullock would say is for her to be careful."  *Id.*  Although Ms. Bullock has denied making these statements, they are taken as true for the purposes of summary judgment.

At the onset, it is important to note that the alleged comments of Mr. Campbell do not reflect discriminatory attitude(s) regarding persons falling within protected classes. As such, they do not qualify for treatment under *Price Waterhouse*.

*See* <u>Glanzman v. Metropolitan Mgmt. Corp.</u>, 391 F.3d 506, 512 (3d Cir. 2004) ("[t]o be 'direct [evidence]' for purposes of the *Price Waterhouse* test," plaintiff "must produce evidence of discriminatory attitudes about [the protected class] that were causally related to the decision to fire her") (citation omitted).

Furthermore, the alleged comments of Mr. Campbell do nothing to disprove the admitted improper conduct of Ms. Dowling, nor do they cast reasonable doubt on the Defendant's decision to terminate her based on the same.  The Plaintiff's allegations regarding Mr. Campbell are insufficient to defeat the Bank's entitlement to summary judgment.

>           D.   The Comparators Identified by the Plaintiff Were
>                <u>Not Similarly Situated.</u>

In attempting to show pretext, counsel points to the more favorable treatment of SSR Ms. Rotolo and Branch Manager Scott Vidovich.

Within the context of employee discipline, the Plaintiff must demonstrate that similarly situated non-protected persons were treated more favorably than her.  <u>Sherrod v. Booker T. Washington Ctr.</u>, 2006 WL 2707317, *8 (W.D. Pa. Sept. 19, 2006) (Cercone, J.) (citation omitted).  The comparator(s) must have been "similarly situated in all material respects," having engaged in similar conduct "without such differentiating or

-13-

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citations omitted).  This includes inquiries into the comparators' relative position within the company hierarchy, as well as their degree of culpability.  *See, e.g.*, <u>Castleberry v. Boeing Co.</u>, 880 F. Supp. 1435, 1441 (D. Kan. 1995) ("an employer may expect a higher level of conduct from management as compared to nonmanagement personnel") (collecting cases); <u>Benton v. ARA Food Servs., Inc.</u>, 1993 WL 425183, *1 (4th Cir. Oct. 21, 1993) ("differing degrees of culpability warrant different punishments") (citing published decision).

Although Ms. Rotolo engaged in the same type of questionable conduct, she was not similarly situated.  As a relatively low level, non-management employee, she was held to a lesser standard than Branch Manager Ms. Dowling.  *See* <u>Castleberry</u>.  Notably, moreover, a person within the Bank branch more closely approximating the Plaintiff's position, Assistant Branch Manager Braun, was terminated for the same and related conduct.  *See* Def.'s Statement of Facts at ¶¶ 10, 13 (citing record evidence). In any event, the Bank was entitled to apply a higher standard to Ms. Dowling, who "by virtue of [her] managerial position[ was] expected to know better."  *See* <u>Sarsha v. Sears, Roebuck & Co.</u>, 3 F.3d 1035, 1042 (7th Cir. 1993).

-14-

Next is branch manager Scott Vidovich, who failed to properly conduct teller audits, resulting in a teller manager's stealing $69,800.00.  *See* Pl.'s Opp'n Br. at 14.  Mr. Vidovich received a written warning, and the Plaintiff argues that his more favorable treatment supports her claim of pretext.

Mr. Vidovich's omission was a far cry from the intentional, deliberate acts of Ms. Dowling.  *See, e.g.*, Parker v. U.S. Postal Serv., 1988 WL 107167, *1 (6th Cir. Oct. 17, 1988) (plaintiff was not similarly situated to "employees with whom [he] tried to compare himself," as none "were guilty of deliberate misconduct"), *cert. denied*, 490 U.S. 1048 (1989).  Mr. Vidovich's conduct was not of sufficiently similar culpability, and the Plaintiff's comparison is unavailing.

E.   The Defendant's Purported Failure to Follow Its Progressive Discipline Policy Does Not Demonstrate Pretext.

Ms. Dowling complains that, under the Bank's Retail Incentive Program policy, she should have received a warning for her questionable account activities before being terminated.  *See* Pl.'s Opp'n Br. at 15-16.  The Plaintiff's own evidence, however, reveals that the policy specified "[v]ery [s]erious [o]ccurrence[s] of gaming, altering or modifying results" would result in termination.  *See* Pl.'s Counter-Statement of Facts at ¶ 13 (citing record evidence).  Indeed, the Defendant's discovery of the Plaintiff's 114 suspicious accounts would appear

to qualify.  *See* discussion *supra*.[4]

Even assuming the contrary, the Bank's failure to issue a warning does not cast reasonable doubt on its legitimate, non-discriminatory reasons for termination.  Given the Plaintiff's high placement in branch management and the deliberate nature of her conduct, the Bank had more than adequate justification for its decision.

> F.   Mr. Campbell's Purported Desire to Replace Older Branch Managers

Finally, the Plaintiff highlights the testimony of Ms. Bullock that Mr. Campbell was motivated to replace aging branch managers with younger individuals because they "would be more likely to reach their performance goals."  *See* Pl.'s Opp'n Br. at 17.

---

[4]  The Plaintiff argues the court should reject Mr. Clydesdale's declaration as containing "post hoc justifications" for her discharge. *See* Pl.'s Opp'n Br. 17; *see also id.* at 18 (complaining that information contained in declaration was not provided to Mr. Campbell until after he decided to terminate Ms. Dowling).  The fact that Mr. Campbell may not have known the precise number of suspect accounts does not undermine his decision, however.  *See, e.g.*, Dep. Tr. of C. Campbell (filed under Doc. 31-4) at 51-52 ("initial feedback" revealed "a number of [suspicious] accounts," and "periodic updates [were] given" regarding "the severity [and] depth of" aggrieved conduct).  Counsel also argues that Mr. Clydesdale "does not appear" to have personal knowledge regarding some documentation attached to his declaration because aspects of the investigation and its findings were conducted by Ms. Yates.  *See* Pl.'s Opp'n Br. 17-18.  It remains undisputed, however, that Mr. Clydesdale and Ms. Yates worked together in conducting the investigation.  Plaintiff counsel has not cited, and the undersigned is unaware of, legal authority dictating that Mr. Clydesdale was required to conduct every stage of the investigation to possess personal knowledge regarding the findings. Mr. Clydesdale's declaration is of the type routinely submitted and relied upon at the summary judgment stage, and the Plaintiff's objections are without merit.

-16-

A review of the testimony reveals the Plaintiff's evidence to be much thinner than suggested.  As to Mr. Campbell's purported desire to retain younger branch managers, Ms. Bullock confirmed that this perception "was [based] more on rumor than anything else."  *See* Dep. Tr. of C. Bullock (filed under Doc. 31-3) at 53.  The witness specifically denied hearing Mr. Campbell make ageist statements, nor could she identify any other persons who attributed such comments to him.  *Id.* at 73-74. And though Ms. Bullock asserted Mr. Campbell was "bringing in all these young kids as branch managers," she could identify no one by name, and her testimony otherwise was ambiguous at best.  *See id.* at 72 (upon review of "long E-mail" list, witness identified only unnamed managers in Monroeville, Bloomfield, and Zelienople).

Ms. Bullock's largely unsubstantiated suspicions of ageism cannot sustain Ms. Dowling's burden on summary judgment. To warrant meaningful consideration, it remained incumbent on the Plaintiff to provide far more in the way of background, detail, and context.  *Cf., e.g.*, <u>Cameron v. Infoconsulting Intl., LLC</u>, 2006 WL 1450842, *10-11 (E.D. Pa. May 23, 2006) ("statistical evidence [i]s not probative [where the] plaintiff['] s [r]aw numerical comparisons" are "not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period"; even less persuasive is

-17-

plaintiff who "do[es] not even go so far as to offer raw number comparisons, but [instead] offer[s] . . . subjective observations" because "personal beliefs, conjecture and speculation are insufficient to support an inference" of discrimination) (citations and internal quotations omitted).

Ms. Bullock's vague suppositions are insufficient to cast reasonable doubt on the Defendant's legitimate, non-discriminatory reasons.

**<u>CONCLUSION</u>**

The Plaintiff has failed to produce sufficient evidence of pretext, and the Defendant's Motion for Summary Judgment should be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this report and recommendation are due by February 5, 2007.  Responses to objections are due by February 15, 2007.

January 18, 2007

Francis X. Caiazza
U.S. Magistrate Judge

cc (via email):

Gregory T. Kunkel, Esq.
James P. Hollihan, Esq.

-18-